United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 97-3197

_____

United States of America,           *
                                     *
            Appellee,                *
                                     *
      v.                             *     Appeal from the United States
                                     *     District Court for the District
Jerry D. Jensen,                     *     of Nebraska.
                                     *
            Appellant.               *

_____

Submitted: January 13, 1998
    Filed:  April 2, 1998

_____

Before RICHARD S. ARNOLD, Chief Judge, BRIGHT and WOLLMAN, Circuit
      Judges.

_____

BRIGHT, Circuit Judge.


      Jerry Jensen appeals the judgment of conviction on one count of conspiracy to distribute amphetamine and his sentence of 150 months.  Jensen contends that insufficient evidence exists to support his conspiracy conviction.  Jensen also argues that because the government failed to specifically prove the existence of a conspiracy between Jensen and Todd Milbourn, the district court erred in admitting into evidence tape-recorded conversations of Milbourn planning a drug sale to an undercover police informant.  With respect to his 150-month sentence, Jensen asserts that the district

court erred in imposing a two-point enhancement for possession of a firearm, and by denying his request for a downward departure because of his deteriorating health. Because sufficient evidence in the record does not support Jensen's conviction for conspiracy to distribute amphetamine, we reverse.[1]

## I.    BACKGROUND

On August 6, 1996, the Lincoln Police Department arrested Todd Milbourn when Milbourn attempted to sell three grams of amphetamine ("crank") to James Monlyn, an undercover police informant. Milbourn identified appellant Jensen as his source for crank. Following the arrest of Milbourn, officers of the Lincoln/Lancaster County Narcotics Unit arrested Jensen. Subsequent searches of Jensen's residence and vehicles produced substantial amounts of amphetamine and money, drug paraphernalia, an address book, a pager, and a .22 caliber revolver with a holster and ammunition.

At Jensen's trial, the government relied upon the testimony of several of Jensen's alleged co-conspirators to establish the existence of a conspiracy. The alleged co-conspirators, including Milbourn, James Phipps, Michael Ernst, Melayne Danekas, and Paula Waldren, all testified on behalf of the government pursuant to plea agreements. Milbourn met Jensen about three years before the trial of this case through a mutual friend, Chris Muggy. Milbourn testified that he obtained crank from Jensen about three times per week, a half-gram to two grams at a time. Milbourn stated that Muggy had a similar pattern of purchasing crank. According to Milbourn, he and Muggy often used crank together and shared drugs with each other. Milbourn admitted that he had a "pretty bad" drug habit during the three years prior to his August 6th arrest.

---

[1]In light of our ruling that sufficient evidence does not support Jensen's conviction, we need not reach other issues raised by Jensen in this appeal.

Milbourn only identified one person, Monlyn (the police informant), as someone to whom Milbourn sold drugs that were originally obtained from Jensen. Otherwise, Milbourn's testimony only indicates that he and Muggy personally used the drugs purchased from Jensen. The record shows that Milbourn sold Monlyn crank on three separate occasions in July and August of 1996, totaling approximately four grams. Milbourn testified that on the day of his arrest, Monlyn drove Milbourn to Jensen's home, where Monlyn waited outside and down the street while Milbourn went into Jensen's home to purchase the crank. Milbourn testified that after he made his purchase, he went into Jensen's bathroom and closed the door. Milbourn then took some of the crank out and replaced it with Fruit Fresh[2] so that he could keep some crank for himself without Monlyn's knowledge. On this occasion, and on previous occasions, Milbourn witnessed other individuals purchasing crank from Jensen. On previous occasions, Milbourn also witnessed Jensen in possession of a large amount of money and drugs, and a handgun.

At trial, the government introduced several tapes of phone conversations and in-person conversations between Monlyn and Milbourn in which the two men planned Milbourn's three sales of crank to Monlyn. The district court allowed these tapes to go to the jury over Jensen's hearsay objections because the district court determined that the taped conversations constituted admissions of Jensen's co-conspirator, Milbourn.

James Phipps met Jensen through a mutual acquaintance, Larry Wilson. Phipps testified that he advanced, or fronted, one-half gram ($50.00 sale price) of crank to Jensen. Phipps asserted that mere users of drugs usually did not purchase drugs in this manner. Phipps also testified that Jensen had been present on several occasions when Phipps fronted crank to Larry Wilson and on occasions when Phipps collected money

[2]Testimony at trial established that Fruit Fresh, a brand name for a food preservative, serves as a substance for diluting some types of drugs, including crank.

from Wilson. Although Phipps did not have any personal knowledge of Wilson's relationship with Jensen, Phipps "believed" that Jensen helped Wilson distribute drugs. However, Phipps acknowledged that Wilson never actually told him that Wilson had any persons selling drugs for him.

Michael Ernst met Jensen through Ernst's girlfriend, Julie Burt. Ernst testified that he received approximately one-fourth to one-half gram of crank from Jensen. Ernst further testified that he sold approximately one and one-half ounces of crank to Jensen. With respect to Burt, Ernst's girlfriend, Ernst stated that although he did not see any transactions between Burt and Jensen, Ernst believed that Burt sold drugs to Jensen. Ernst, however, did not provide any details of Burt's alleged sales to Jensen, including the amount of drugs involved.

Melayne Danekas met Jensen through her friend, Shelly Fetty. Danekas testified that she sporadically used and sold crank for about ten years. Danekas estimated that she purchased crank from Jensen on approximately five occasions. On one occasion, Danekas stated that she overheard a discussion between Fetty and Jensen relating to a trip Fetty and Jensen took to Grand Island in order to obtain drugs. Danekas stated that Fetty appeared angry at Jensen because Jensen had left Fetty in Grand Island. According to Danekas, Jensen left Fetty in Grand Island because the two had not obtained any drugs and Jensen wanted Fetty to remain in Grand Island to continue looking for drugs. Danekas also testified that she witnessed numerous other people buying crank from Jensen.

Paula Waldren, Jensen's girlfriend, testified that she witnessed many people in their home buying drugs. Waldren testified that she made Jensen keep his drugs in a locked box because of their small child. Waldren also stated that the gun that police found in their search belonged to Jensen's father and that Jensen kept it as collateral for a loan of money that Jensen made to his father.

-4-

The jury returned a guilty verdict on one count of conspiracy to distribute amphetamine. At the sentencing hearing, Jensen moved the district court for a downward departure under § 5K2.0 and § 5H1.4 of the Sentencing Guidelines based upon the diagnosis that Jensen has a serious health condition. The district court denied Jensen's motion for downward departure, stating that "[t]he evidence is insufficient . . . to conclude that a downward departure is justified." The district court determined that Jensen had a criminal history category of VI and an offense level of 26, which included a two-point enhancement under § 2D1.1(b)(1) of the Sentencing Guidelines based upon discovery of a .22 caliber handgun at Jensen's home. The district court sentenced Jensen to 150 months imprisonment.

## II.   DISCUSSION

Jensen argues that insufficient evidence exists in the record to support his conviction for conspiracy to distribute amphetamine. In reviewing a challenge to the sufficiency of the evidence, we may reverse a jury's verdict only where a reasonable fact-finder must have harbored reasonable doubt relating to the government's proof on at least one of the essential elements of the offense. United States v. McCracken, 110 F.3d 535, 540 (8th Cir. 1997). In applying this standard, we allow the jury's verdict the benefit of all reasonable inferences from the record. Id.

In a conspiracy prosecution, the government must prove beyond a reasonable doubt: (1) the existence of an agreement to achieve some illegal purpose; (2) "that the defendant knew of the agreement[;]" and (3) "the defendant knowingly became a part of the conspiracy." United States v. Ivey, 915 F.2d 380, 383-84 (8th Cir. 1990) (citation omitted). In the present case, we conclude that while the government's case may establish a series of small quantity, buyer/seller transactions, the record does not establish that Jensen participated in any conspiracy to distribute amphetamine.

This court has previously ruled that "a mere sales agreement [between a buyer and seller] with respect to contraband does not constitute a conspiracy . . . ." United States v. West, 15 F.3d 119, 121 (8th Cir. 1994) (citing United States v. Prieskorn, 658 F.2d 631, 633 (8th Cir. 1981)). As stated, several of Jensen's alleged co-conspirators, including Milbourn, Phipps, Ernst, Danekas, and Waldren, testified on behalf of the government pursuant to plea agreements. The government asserts that Milbourn's testimony established a drug distribution conspiracy between Milbourn and Jensen. However, the record reflects that Milbourn testified primarily about his purchases of crank from Jensen for Milbourn's personal use. Milbourn's testimony does not indicate that Milbourn resold the amphetamine as a distribution scheme.[3] Milbourn's testimony reflects that his only resale of crank obtained from Jensen consisted of his sale to Monlyn, the government informant, as part of a setup. However, the record lacks any evidence that Jensen knew of or agreed with Milbourn's plan to resell the crank to Monlyn. Moreover, Milbourn's testimony indicates that on August 6, Milbourn kept secret his intentions to resell the crank by making Monlyn wait outside and down the street from Jensen's home. In addition, Milbourn went into Jensen's bathroom and closed the door to conceal his exchange of Fruit Fresh for some of the crank so that he could personally use some of the crank before selling it to Monlyn. Without any suggestion from Milbourn that Jensen knew of and agreed with Milbourn's plan to resell the crank obtained from Jensen, Milbourn's testimony does not support a conclusion that Jensen and Milbourn participated together in a conspiracy to distribute amphetamine. See West, 15 F.3d at 121.

---

[3]Milbourn testified that he purchased between one-half and two grams of crank about three time a week, depending on how much money Milbourn had at the time. We do not consider this quantity alone as necessitating a conclusion that Milbourn resold the drugs in light of Milbourn's acknowledgment that he had a serious drug problem during this time period. Furthermore, nothing in Milbourn's testimony indicates that Jensen would have known about or assented to Milbourn's reselling of the drugs.

Next, the government asserts that Phipps' testimony established a conspiracy between Phipps and Jensen to distribute amphetamine.  The record reflects that Phipps fronted one-half gram of crank to Jensen on only one occasion.  Phipps testified that he "believed" that Jensen would resell the one-half gram of crank, because mere buyers did not usually purchase crank on a front basis.  However, Phipps stated that he had no actual knowledge of whether Jensen resold or personally used the one-half ounce of crank.  In addition, Phipps testified that he believed Jensen assisted Wilson in distributing drugs because Phipps occasionally saw Jensen with Wilson when Phipps collected money from Wilson.  Phipps admitted, however, that he had no personal knowledge to support this belief.  In fact, Phipps testified that Wilson never informed him that anyone assisted him in his drug distribution.  Accordingly, we conclude that Phipps' testimony does not establish that Jensen participated in a conspiracy to distribute amphetamine.  See Ivey, 915 F.2d at 384 ("Evidence of association or acquaintance, though relevant, is not enough by itself to establish a conspiracy.") (citations omitted); United States v. Hernandez, 986 F.2d 234, 236 (8th Cir. 1993) ("Mere presence at the location of the crime alone, even when coupled with knowledge of that crime, is not sufficient to establish guilt on a conspiracy charge.") (citation omitted).

With respect to Melayne Danekas, we note that Danekas testified that she overheard Jensen and Shelly Fetty discussing a trip to Grand Island to purchase drugs. Danekas, however, did not testify that Jensen and Fetty actually obtained drugs.  In fact, according to Fetty, Jensen left Fetty at Grand Island because they could not purchase drugs.  The remaining portion of Danekas' testimony related to Jensen selling crank to various individuals.  We conclude that this testimony amounts to nothing more than evidence of mere buyer/seller exchanges, which does not establish the existence of a conspiracy. See West, 15 F.3d at 121.

Finally, after reviewing Paula Waldren's testimony, we conclude that Waldren's testimony does not indicate that Jensen participated in any conspiracy to distribute

drugs. Waldren obviously knew Jensen sold drugs to others because Jensen carried on most of his sales in their home. However, at no point during Waldren's testimony does she describe any situation that would suggest that Jensen conspired with anyone else to distribute amphetamine.

## III. CONCLUSION

In any conspiracy charge, the government possesses the burden of proving beyond a reasonable doubt that the defendant knowingly agreed to become part of a conspiracy to achieve an illegal purpose. While the evidence establishes that Jensen sold significant amounts of drugs to numerous individuals, the government did not charge him with any substantive offense. The government only charged Jensen with conspiracy to distribute amphetamine, which the government did not prove in this case. Accordingly, we reverse the district court's judgment of conviction.

RICHARD S. ARNOLD, Chief Judge, dissenting.

I agree with much of what the Court says. Most of the government's evidence at this trial showed only buyer-seller relationships. The testimony of Melayne Danekas, however, seems to me to support a reasonable inference that Jensen was a party to a conspiracy to distribute methamphetamine. This testimony is summarized in the Court's opinion, ante at 4. I believe the jury could reasonably infer from this evidence that Jensen and Fetty agreed to go to Grand Island to buy drugs for resale. This would be sufficient evidence to support a conviction.

A true copy.

Attest:

　　　CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.